D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
RICHMOND INDUSTRIAL CENTER, INC.,

              Plaintiff,

-against-

THE FERRY THE GOV. HERBERT H. LEHMAN,
*her engines, boilers, tackle, apparel, furnishings,
appurtenances, etc. and all other necessaries*, LA
VIVIANA INDUSTRIES, INC., TERRACE GATE
REALTY, LLC, TAHMAZ REALTY, LLC, YASAR
TAHMAZ, *individually*, JACK MOWBRY,
*individually*, and HELEN MARKIDOS, *individually*,

              Defendants.
----------------------------------------------------------X

**MEMORANDUM & ORDER**

**10-CV-5586 (NGG) (CLP)**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAY 13 2011 ★
BROOKLYN OFFICE

NICHOLAS G. GARAUFIS, United States District Judge.

    Before the court is Defendant Yasar Tahmaz's motion to dismiss for lack of subject matter jurisdiction. (Tahmaz Mot. (Docket Entry # 21).) For the reasons set forth below, the court grants the motion.

**I.    BACKGROUND**

    On December 2, 2010, Plaintiff Richmond Industrial Center, Inc. ("Richmond") filed a Complaint against La Viviana Industries, Inc. ("La Viviana"), Jack Mowbry ("Mowbry"), Yasar Tahmaz ("Tahmaz"), Tahmaz Realty, LLC ("Tahmaz Realty"), Terrace Gate Realty, LLC ("Terrace Gate"), and The Ferry *The Gov. Herbert H. Lehman* (the "Ferry"), an out-of-commission Staten Island ferry. (Compl. (Docket Entry # 1).) Richmond alleges that it owns a parcel of land with an attached concrete pier, located at 3075 Richmond Terrace, Staten Island, New York. (See id. ¶ 9.) On April 2, 2007, Richmond sold a portion of its property to Rasay Corp. ("Rasay"), including the concrete pier, subject to a mortgage. (Id. ¶ 12.) The mortgage included a restriction that prohibited Rasay from selling its ownership in the property without

1

first obtaining permission from Richmond. (Id. ¶ 13.) Despite this provision, Richmond alleges that Rasay wrongfully sold the property to Terrace Gate and Tahmaz Realty in 2008—subject to another mortgage—without first obtaining Richmond's consent. (Id. ¶ 14.) After Terrace Gate defaulted on its mortgage to Rasay, the parties engaged in state court proceedings to quiet title to the premises. (Id. ¶¶ 15-21.) Sometime during the pendency of those proceedings, Terrace Gate and Tahmaz entered into an agreement with La Viviana to allow it to moor the Ferry to a concrete pier on the mortgaged property. (Id. ¶ 23.) In its Original Complaint, Richmond alleged that the Ferry was improperly moored to the pier and posed a danger to "property, environment and life." (Id. ¶ 24.)

From December 2, 2010 to January 18, 2011, the court presided over several conferences among the parties regarding moving the Ferry from Richmond's pier. On December 2, 2010, the court directed the United States, as an interested party, to file a letter with the court "detailing the United States Coast Guard's views on the safety of the vessel, as presently moored, and steps that may be necessary to render the vessel reasonably safe to the public." (Docket Entry Dec. 2, 2010.) On December 9, 2010, the Coast Guard issued a "tow plan" under 33 C.F.R. § 160.111, describing its views of the safety of moving the Ferry. (Tow Plan (Docket Entry # 8).)

On January 19, 2011, Richmond filed an Amended Complaint adding Helen Mardikos ("Mardikos"), a lienor to the Ferry, as a defendant. (Am. Compl. (Docket Entry # 14).) On March 20, 2011 and March 31, 2011, Richmond filed separate motions requesting the sale of the Ferry to Richmond and an order of dismantling so that Richmond could sell the Ferry for scrap. (Docket Entries ## 17, 20.) On April 12, 2011, Tahmaz filed a motion to dismiss for lack of subject matter jurisdiction. (Tahmaz Mot.) On April 29, 2011, the court held a status conference to discuss several outstanding issues in the case. (Docket Entry Apr. 29, 2011.) At the status

conference, the parties alerted the court to the fact that La Viviana had sold the Ferry to a non-party, Mothership Hotel, LLC ("Mothership Hotel"). (Id.) The court then set a briefing schedule for responses to Tahmaz's motion to dismiss. (Id.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows defendants to challenge the court's subject matter jurisdiction by means of a motion to dismiss. In reviewing a motion to dismiss under Rule 12(b)(1), courts must "accept as true all material factual allegations in the complaint," Shipping Fin. Serv. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citation omitted), but refrain from "drawing from the pleadings inferences favorable to the party asserting [jurisdiction]," APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (citation omitted). In assessing a motion to dismiss for lack of subject matter jurisdiction, "courts are permitted to look to materials outside the pleadings." Romano v. Kazacos, 609 F.3d 512, 520 (2d Cir. 2010). These may include "sworn affidavits from both parties, correspondence between the parties and other relevant documents." See King's Gym Complex, Inc. v. Phila. Indem. Ins. Co., 314 F. App'x 342, 343 (2d Cir. 2008). "A plaintiff asserting subject matter jurisdiction has the burden of proving its existence by a preponderance of the evidence." Jordan v. Verizon Corp., 391 F. App'x 10, 12 (2d Cir. 2010).

## III. DISCUSSION

### A. The Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 30101

The United States Constitution provides that "[t]he judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2. Prior to 1948, federal courts, in addressing whether a case fell within their admiralty and maritime jurisdiction, "asked only whether the tort occurred on navigable waters. If it did, admiralty jurisdiction followed; if it did not, admiralty jurisdiction did not exist." Jerome B. Grubart, Inc. v. Great Lakes Dredge &

3

Dock Co., 513 U.S. 527, 531 (1995). This caused the peculiar problem of excluding from the federal courts' admiralty jurisdiction cases in which ships caused damage to terrestrial property, or vice versa. See Martin v. West, 222 U.S. 191, 197 (1911). "Thus, admiralty courts lacked jurisdiction over, say, a claim following a ship's collision with a pier insofar as it injured the pier, for admiralty law treated the pier as an extension of the land." Grubart, 513 U.S. at 532. Congress sought to mend this jurisdictional leak by enacting the Extension of Admiralty Jurisdiction Act in 1948 (the "Extension Act"), which conferred federal maritime jurisdiction to "all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C. App'x § 740 (1948); see also Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 209 (1963) ("[T]he Extension of Admiralty Jurisdiction Act swept [the old rule] away when it made vessels on navigable water liable for damage or injury notwithstanding that such damage or injury be done or consummated on land." (internal punctuation and citations omitted)). Today, the Extension Act is codified at 46 U.S.C. § 30101.

  1. <u>Defining the Term "Vessel" Under the Extension Act</u>

In Grubart, the Supreme Court explained that

> a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

513 U.S. at 534 (internal citations and punctuation omitted). Because the parties in Grubart did not dispute the character of the barge at issue, however, the Court declined to define the term

"vessel" under the location test. See id. at 535.

Later, in Stewart v. Dutra Constr. Co., 543 U.S. 481, 488 (2005), the Court described "how to determine whether a watercraft is a 'vessel'" under the Longshore and Harbor Workers' Compensation Act (the "LHWCA"). Like the Extension Act, the LHWCA uses, but does not define, the term "vessel." See 33 U.S.C. §§ 901-950. Nonetheless, the Stewart Court concluded that though Congress "did not define the term 'vessel' in the LHWCA itself . . . . Congress provided a definition elsewhere," specifically, in the Revised Statutes of 1873. 543 U.S. at 488-89. There, for any statute passed after February 25, 1871, Congress directed the courts to define "vessel" as "every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 18 Stat., pt. 1, p. 1; see also Stewart, 543 U.S. at 489. This definition was later incorporated, verbatim, into the Rules of Construction Act, at 1 U.S.C. § 3. Stewart, 543 U.S. at 489-90. Because the LHWCA was silent regarding the definition of "vessel"; because the LHWCA was passed after February 25, 1871; and because the context surrounding the LHWCA did not "indicate otherwise," see 1 U.S.C. § 1, the Stewart Court concluded that the definition of "vessel" in 1 U.S.C. § 3 applied to the LHWCA. 543 U.S. at 489-90.

Both Stewart and Grubart counsel that the definition of "vessel" in 1 U.S.C. § 3 should apply to the Extension Act. Like the LHWCA, the Extension Act is silent regarding the definition of "vessel" and was passed after February 25, 1871. See 46 U.S.C. § 30101. And nothing surrounding the context of the Extension Act—either its text or the history of its enactment—indicates that another definition should apply. Cf. Stewart, 543 U.S. at 490 ("The context surrounding the LHWCA's enactment indicates that § 3 defines the term 'vessel' for purposes of the LHWCA" (citing 1 U.S.C. § 1)); Rowland v. Calif. Men's Colony, Unit II Men's

Advisory Council, 506 U.S. 194, 199 (1993) ("'Context' here means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts . . . ." (citing 1 U.S.C. § 1)). In addition, the Grubart Court's application of the term "vessel" implicitly incorporated the definition found in 1 U.S.C. § 3. Compare Grubart, 513 U.S. at 535 ("[The defendant] must also have done it 'by a vessel.' Even though the barge was fastened to the river bottom and was in use as a work platform at the times in question, at other times it was used for transportation."), with 1 U.S.C. § 3 ("The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."). Accordingly, the court concludes that the term "vessel" in the Extension Act means any "watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." See 1 U.S.C. § 3.

2. "Used, or Capable of Being Used, as a Means of Transportation"

In Stewart, the Court fleshed out the meaning of "used, or capable of being used, as a means of transportation" in § 3. 543 U.S. at 493-95. Analyzing two of its prior precedents, the Stewart Court concluded that a watercraft was not "capable of being used as means of transportation" if it was "not *practically* capable of being used to transport people, freight, or cargo from place to place." Id. at 493. The Court noted that in Cope v. Vallette Dry-Dock Co., 119 U.S. 625 (1887), it held that a drydock was not a "vessel" for purposes of federal admiralty jurisdiction because it was "moored and lying at the usual place it had occupied for the past 20 years." Stewart, 543 U.S. at 493 (quoting Cope, 119 U.S. at 627) (internal punctuation omitted). And in Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co., 271 U.S. 19 (1926), it had found that a "wharfboat secured by cables to the mainland [where l]ocal water, electricity, and telephone lines all ran from shore to the wharfboat" was not a "vessel" because it "was neither taken from place to place nor used to carry freight from one place to another." Stewart,

543 U.S. at 493 (quoting Evansville, 271 U.S. at 22) (internal punctuation omitted). This meant that the wharfboat "was not practically capable of being used as a means of transportation." Id. (quoting Evansville, 271 U.S. at 22) (internal punctuation omitted). In light of these cases, the Stewart Court concluded that "[s]imply put, a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement."[1] Id. at 494. Because the dredge at issue in Stewart had "limited means of self-propulsion .... navigat[ing] short distances by manipulating its anchors and cables," id. at 484, it was "engaged in maritime transportation" and therefore a "vessel" under § 3. Id. at 497; see also Grubart, 513 U.S. at 535 (concluding that the barge at issue was a "vessel" "[e]ven though the barge was fastened to the river bottom [because] it was used for transportation."). Therefore, a watercraft is not a "vessel" for purposes of admiralty jurisdiction if it "has been permanently moored or otherwise rendered practically incapable of transportation or movement." See Stewart, 543 U.S. at 494.

### B. Admiralty Jurisdiction over The Ferry the Governor Herbert H. Lehman

The *Governor Herbert H. Lehman* is a Kennedy-class Staten Island Ferry that began service in 1965. NYC DOT – Staten Island Ferry, N.Y.C. Dep't of Transp., http://www.nyc.gov/html/dot/html/ferrybus/statfery.shtml (last visited May 6, 2011). While in service, it was able to carry 3,500 passengers, serviced by 13 crew members. Id. Like its sister Kennedy-class ferries, the *Governor Herbert H. Lehman* was built "297 feet long, 69 feet 10 inches wide, with a draft of 13 feet 6 inches, [having] 2,109 gross tonnage, [a] service speed of 16 knots, and 6,500 horsepower." Id. On Friday June 30, 2007, after forty-two proud years of service, the *Governor Herbert H. Lehman* was retired and received the traditional farewell parting salute of three blasts

---

[1] This analysis appears to parallel the older, common law "dead ship" or "dead vessel" doctrine, which similarly excluded from the courts' admiralty jurisdiction cases involving watercraft that were not "vessels in navigation," as determined by the "status of the ship." See Roper v. United States, 368 U.S. 20, 22-23 (1961).

from the Ferry's horn. (Tahmaz Mot. Ex. A.); see also Gordon R. Newell, Pacific Steamboats 195 (1958) ("Three Blasts of the Whistle Mean Goodby. . . . [Ships] tendered him the traditional parting salute of steamboat men . . . three whistle blasts.") (second alteration in original). Since approximately the end of 2007, the Ferry has been berthed at Richmond's pier. (See Tahmaz Mot. at 2.)

Tahmaz argues that the Ferry is not within the court's admiralty jurisdiction. (Id.) To support his claim, Tahmaz avers that the Ferry "has no crew and lies dormant and inoperable." (Id. at 2.) Tahmaz also states that the Ferry was sold for scrap to La Viviana in 2007, and attaches several newspaper articles about the Ferry to that effect. (Id. at 2; Exs. B, D, E.) The current owner of the Ferry, Mothership Hotel, provides even greater proof of the Ferry's inoperability, in the form of an affidavit signed by Jacques Guillet, the former manager of La Viviana. It states:

> [T]hroughout the period of [the Ferry's] ownership by La Viviana, the Ferry was without a master or a crew. Its engines were disabled, having been partially cannibalized. It had no working navigation lights, or interior lights. Indeed, it did not even have a functioning electrical system of any kind, and was incapable of generating any onboard power. Its main steering system was disabled. At no time during La Viviana's ownership was the Ferry every [sic] documented with the United States Coast Guard, nor was it subject to inspection by that service. And throughout that time, it was never used or operated as a ferryboat, or in any other capacity for the transportation of people or goods over water, or otherwise made available for such work. La Viviana never hired a captain or crew for the Ferry. At all times, the Ferry was completely disabled from engagement in such commerce.

(Guillet Decl. (Docket Entry # 36-1) ¶ 3.)

Further, the tow plan issued by the Coast Guard on December 9, 2010 under 33 C.F.R. § 160.11—colloquially referred to as a "Dead Ship Tow Plan," see USS Cabot CVL 28 Assoc., Inc. v. Josiah, No. Civ. A. 98-0154, 1998 WL 315387, at *1 (E.D. La. June 12, 1998)—also suggests that the Ferry is "practically incapable of transportation or movement." See Stewart,

8

543 U.S. at 494. The Plan required that the Ferry provide documentation as to whether she was suitable for towing; be towed by two towing vessels if she was suitable—three, where wind gusts exceeded twenty knots; and produce a surveyor's report attesting to her "water tight integrity." (Tow Plan at 1.) Nothing in the Plan suggests that the Ferry was even remotely capable of self-propulsion or transportation in any form. See Stewart, 543 U.S. at 484 (concluding that a dredge was a "vessel" where it had limited means of self-propulsion); Grubart, 513 U.S. at 535 (concluding that the barge at issue was a "vessel" "[e]ven though the barge was fastened to the river bottom [because] it was used for transportation"). Indeed, the Tow Plan suggests not just that the Ferry is practically incapable of transportation or movement, but practically difficult to *tow*.

Richmond offers little to contest these allegations, other than several unsworn and unsupported statements that the Ferry was not originally sold for scrap to La Viviana. (Pl.'s Opp'n (Docket Entry # 32) at 2, 3, 4, 15.) Richmond also attaches an article from the Daily News, stating that La Viviana attempted to sell the Ferry on eBay as a floating attraction rather than as scrap. (Id. (Docket Entry # 32-7) Ex. F.)

In sum, Richmond has not carried its burden of proving that the Ferry was practically capable of transportation or movement. See Jordan, 391 F. App'x at 12 (stating that the party asserting subject matter jurisdiction must provide its existence by a preponderance of the evidence); Grubart, 513 U.S. at 534 (concluding that admiralty jurisdiction exists where the watercraft was practically capable of transportation or movement). Indeed, the great weight of the evidence before the court, from the Ferry's former and current owners and from the United States Coast Guard, strongly suggests that the Ferry was—and still is—wholly inoperable as a seaworthy vessel capable of transportation. Because it appears that the Ferry has been "rendered

practically incapable of transportation or movement," the injury alleged by Richmond was not "caused by a vessel on navigable water." See Grubart, 513 U.S. at 534. As such, the Ferry fails the location test set forth in Grubart and the court lacks admiralty jurisdiction over in the instant action. See id.

The court recognizes that one of the purposes of the Extension Act was arguably to place within a federal court's jurisdiction "a claim following a ship's collision with a pier insofar as it injured the pier." See id. at 532. Nonetheless, it is clear from both Grubart and Stewart that the Extension Act was not intended as a jurisdictional trawling net for the federal courts to capture anything with a "genuinely salty flavor." Optimum Shipping & Trading, S.A. v. Prestige Mar. Servs. Pte. Ltd., No. 08-cv-9533 (JSR), 2009 WL 497341, at *1 (S.D.N.Y. Feb. 26, 2009) ("[I]t may well be that a vessel that . . . neither transports goods nor people lacks the 'genuinely salty flavor' that would otherwise favor the recognition of maritime jurisdiction." (quoting Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 22 (2004))). Where the object causing injury on land is not a "vessel," federal courts lack jurisdiction over the action even where facts giving rise to the claim are associated with a traditional maritime activity. See Grubart, 513 U.S. at 534 ("[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions *both* of location *and* of connection with maritime activity") (emphasis added). Because there is no putative basis for jurisdiction aside from admiralty, Richmond's Amended Complaint will be dismissed for lack of subject matter jurisdiction.

C. **Richmond's Request for Leave to Amend Its Amended Complaint**

In its Opposition, Richmond requests leave to amend its Amended Complaint in the event the court concludes that it lacks subject matter jurisdiction over the action. (Pl.s' Opp'n at 15-17.) Despite multiple status conferences, this is the first time Richmond has raised its request to the court. Richmond's request is denied. "Although Rule 15(a) of the Federal Rules of Civil

10

Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Id. In its request, Richmond does not point to any additional facts that it could assert to alter the conclusion that the Ferry is practically incapable of transportation. Richmond only states that it seeks to "include the Mothership Hotel as the owner of the vessel, Vivian Marescot, in whose name the ferry was registered with the Coast Guard and to reflect the additional torts committed by Jacques Guillet individually." (Pl.'s Opp'n at 16.) But each of these issues is beside the point. Even if the court granted Richmond's request, the court would still lack jurisdiction over this action; the Ferry would be no more capable of navigating itself away from Richmond's pier and down the Kill van Kull. Richmond's request for leave to amend is, therefore, futile and denied as such.

## IV. CONCLUSION

Defendant Yasar Tahmaz's Motion to Dismiss for Lack of Jurisdiction (Docket Entry # 21) is GRANTED. Plaintiff's request for leave to amend its Complaint is DENIED. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      May 12, 2011

    s/Nicholas Garaufis
    NICHOLAS G. GARAUFIS
    United States District Judge